UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 11-0169 |
| VERSUS | * | JUDGE ROBERT G. JAMES |
| DEMOND ALEXANDER REID | * | MAG. JUDGE KAREN L. HAYES |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 28] filed by defendant, Demond Alexander Reid. For reasons stated below, it is recommended that the motion be **DENIED.**

On June 6, 2011, Louisiana State Police Trooper Linton ("Trooper Linton" or "Linton") stopped Demond Alexander Reid ("Reid") for a traffic violation on Interstate 20 in Ouachita Parish, Louisiana. Pursuant to the stop, the Louisiana State Police ultimately searched Reid's vehicle and uncovered credit reports, two notebooks filled with various individuals' private identification information, multiple fake identification cards bearing pictures of Reid, three cell phones, computer equipment, and other electronic media.

On July 12, 2011, a federal grand jury issued an indictment charging Reid with access device fraud and aggravated identity theft in violation of Title 18, United States Code, Sections 1029(a)(3) and 1028A respectively. Doc. # 16. Having entered a plea of not guilty to the charges against him, Reid has filed the instant motion to suppress evidence obtained as a result of his traffic stop. Doc. # 28. Following a delay for briefing and an evidentiary hearing held on November 1, 2011, the matter is now before the court.

**Background**

The following facts were established via the testimony and evidence presented at the November 1, 2011, hearing held in this matter.

Senior Trooper Michael Linton has been employed as a state trooper with the Louisiana State Police for the past ten years. For the last four years, Trooper Linton has been assigned to the Criminal Interdiction Unit, which patrols the highways of the State for criminal activity such as narcotics, weapons and fugitives.

Deputy Kenneth Russ has been employed with the Ouachita Parish Sheriff's Office for nearly four years. Deputy Russ and his K-9 "Tomek" are certified through the National Police K-9 Association for the detection of marijuana, cocaine and methamphetamine.

On June 6, 2011, Reid was traveling east on I-20 in Ouachita Parish at approximately 2:40 a.m. Louisiana State Police Trooper Linton pulled Reid over after observing him speeding in a sixty mile-per-hour zone.[1] Trooper Linton spoke to Reid from the passenger side window of the 2011 Kia Sorento SUV he was driving. When asked to produce his driver's license and registration, Reid stated that he did not have a driver's license or any picture identification. He explained that his Georgia-issued license had previously been suspended and was now reinstated. Reid indicated he had not yet traveled to Georgia to obtain his reinstated license. In lieu of producing a picture ID, he provided Trooper Linton with a bank card and then a social security card. With respect to the vehicle paperwork, Reid gave Linton an Enterprise rental agreement.

Trooper Linton told Reid that he had been pulled over for speeding in a sixty mile-per-hour zone. Reid responded that he had been traveling seventy miles per hour because that is how

---

[1] Trooper Linton's dash-mounted camera recorded the traffic stop of Reid conducted on June 6, 2011. *See* Gov't Exh. 1.

fast he drives on the road. Reid went on to state that he was traveling from Dallas, Texas, to his home in Georgia and provided other details regarding his travel plans. Linton asked him why he was in Dallas, and Reid stated that he was watching a basketball game, as well as attempting to obtain his birth certificate. Trooper Linton asked him if he had any prior traffic citations or arrests. Reid stated that all of his traffic tickets had been taken care of and that he did not have any previous arrests. At the hearing, Trooper Linton testified that during their relatively brief conversation, Reid appeared excessively nervous. He mumbled, breathed heavily, and had body language such as poor eye contact that appeared deceptive.

    Approximately five minutes after initiating the traffic stop, Trooper Linton returned to his cruiser to run a computer check. After a couple of minutes, he learned that there was a Georgia driver's license on record for an individual with a name matching that given by Reid. Contrary to what Reid had said, Trooper Linton also learned that Reid had three prior arrests for possession of marijuana, theft of property and theft of services. In addition, Trooper Linton also realized that the Enterprise rental agreement provided by Reid was for a Dodge Avenger instead of the Kia Sorento currently in Reid's possession. Moreover, the rental agreement for the Dodge Avenger had ended some thirty days earlier.

    Roughly nine minutes into the traffic stop, Trooper Linton returned to speak to Reid who remained seated in the driver's seat of the Kia Sorento. He asked Reid to produce a valid rental agreement for the vehicle in his possession. This led to a conversation about Reid's habit of renting vehicles rather than purchasing a car of his own. Trooper Linton told Reid that his driver's license information was confirmed but that he had lied about his criminal history. Reid never produced a valid rental agreement for the Kia Sorento he was driving.

    Trooper Linton asked Reid whether he had anything illegal in his vehicle approximately

eleven and a half minutes into the traffic stop. He also asked whether Reid had a problem with Trooper Linton searching the vehicle. Linton testified at the hearing that he asked consent to search because of the following facts: 1) Reid had no picture ID; 2) he had no valid rental agreement; 3) he had a nervous demeanor; 4) he failed to disclose his prior arrests; and 5) he was traveling on a known route for drug trafficking. *See* Tr., pp. 16-17. In response to the request for consent, Reid said that he did not have anything he should not have but that he would rather the trooper not search his vehicle because it made him feel uneasy. Trooper Linton then explained the consent to search request and asked Reid directly if he could search his vehicle. Reid refused to grant consent to Trooper Linton to search his vehicle.

 Linton then asked Reid to step out of the vehicle. Reid said that he would rather stay, and according to Linton he was fidgeting and putting his hands in his pockets. At this time, Linton unholstered his weapon and pointed it at Reid, commanding that he exit the vehicle. After frisking Reid for weapons or other dangerous objects for officer safety reasons, Trooper Linton radioed for K-9 assistance. Trooper Linton made several different radio and phone contacts seeking the assistance of a K-9 unit. Eighteen minutes had elapsed at this point in the traffic stop. While waiting for the arrival of the K-9 unit, Trooper Linton continued to question Reid. Reid repeatedly sought permission to contact his mother, a request which Trooper Linton denied. Reid then inquired whether the K-9 would alert if someone had smoked marijuana in the vehicle a few days prior. The trooper advised him that the dog would alert to the odor of marijuana. Reid looked down when told this and said that he did not want his vehicle searched because it was dirty.

 Deputy Russ and his K-9 arrived on scene approximately twenty-one minutes after Reid refused consent to search (i.e., thirty-three minutes into the traffic stop). The K-9 alerted on the

rear, tail light area of the Kia. A search was conducted, and inside a suitcase Trooper Linton found a brass marijuana grinder containing a small amount of marijuana. He also found credit reports, two notebooks filled with various individuals' private identity information, multiple fake identification cards bearing pictures of Reid, three cell phones, computer equipment, and other electronic media.

## Law and Analysis

### I. The Stop and Detention

Defendant contends that the evidence obtained by the state police should be suppressed because his continued detention following the traffic stop violated his rights under the Fourth Amendment.

The Fourth Amendment of the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. A traffic stop entails a seizure for purposes of the Fourth Amendment. *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc) (stopping a vehicle and detaining its occupants constitutes a seizure). Traffic stops, whether supported by probable cause or a reasonable suspicion, are analyzed under the standard established by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968). *Brigham, supra.* (citations omitted).

Under *Terry*, a law enforcement officer may temporarily detain a person when the "officer has a reasonable, articulable suspicion that a person has committed or is about to commit a crime." *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (citing *Terry*, 392 U.S. at 30). Reasonable suspicion may be described as "'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Id*. (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). To satisfy the Fourth Amendment, the stopping officer must be able to

5

"articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Id*. (citing *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000)). The Fourth Amendment requires but a "minimal level of objective justification for making the stop," and requires "a showing considerably less than preponderance of the evidence." *Id*. (citation omitted). The validity of the stop is determined under "the totality of the circumstances — the whole picture." *Id*. (citing *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989)).

The *Terry* standard a is two-tiered inquiry: (1) whether the officer's action of stopping the vehicle was justified at its inception; and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop. *United States v. Valadez*, 267 F.3d 395, 398 (5th Cir. 2001) (citing *Terry*, 392 U.S. at 19-20). Typically, the defendant bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citation omitted). However, when the law enforcement officer acts without a warrant, the government bears the burden of proving that the search was valid. *Id*.

      a)      <u>*Terry's* First Prong</u>

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).

To the extent that Reid challenges the propriety of the initial stop, his claim is without merit. Trooper Linton testified that he directly observed the vehicle Reid was driving traveling in excess of the posted speed limit, and subsequently confirmed by radar that the vehicle was traveling at sixty-five m.p.h. in a sixty m.p.h. zone. Reid has provided no evidence to controvert

this fact. The undersigned thus concludes that the traffic stop was justified at its inception.

      b)     *Terry's* Second Prong

The second prong of the *Terry* inquiry focuses upon whether the stopping officer's actions were

> reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop. This is because a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop unless further reasonable suspicion, supported by articulable facts, emerges.

*Brigham*, 382 F.3d at 507 (citations omitted).

The Fifth Circuit has recognized that pursuant to an initial traffic stop, a police officer may (1) examine the driver's license and registration of the driver and vehicle, and run a computer check to investigate whether the driver has any outstanding warrants and if the vehicle was stolen; (2) ask the driver to exit the vehicle; and (3) ask the driver and any passengers about the purpose and itinerary of their trip, including other unrelated questions.[2] *See generally Brigham*, 382 F.3d at 508; *United States v. Dortch*, 199 F.3d 193, 198 (5th Cir. 1999); *Shabazz*, 993 F.2d at 437.

Detention during these actions is reasonable under the Fourth Amendment; however, detention which occurs because of additional actions, particularly those taken after a police officer has verified that a driver is not subject to any warrants and that a vehicle is not stolen, may only be taken when there is a reasonable and articulable suspicion that a person has committed or is about to commit a crime. *See United States v. Jones*, 234 F.3d 234, 241 (5th Cir. 2000). "The suspicion required to justify such a detention need not rise to the level of probable

---

[2] "[T]he officer's questions need not even be related to the purpose of the traffic stop, since '[d]etention, not questioning, is the evil at which *Terry*'s second prong is aimed.'" *Lopez-Moreno*, 420 F.3d at 431.

cause but must be based on more than an unparticularized suspicion or hunch." *Id.* (citing *Sokolow*, 490 U.S. at 7). When making a reasonable-suspicion determination, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."[3] *United States v. Grant*, 349 F.3d 192, 197 (5th Cir. 2003) (quoting other sources). If reasonable suspicion appears during the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed. *See Lopez-Moreno*, 420 F.3d at 431 (5th Cir. 2005); *Brigham*, 382 F.3d at 507.

      In this case, then, the question is whether Linton's actions after he legitimately stopped Reid were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion based on articulable facts developed during the stop. First, Trooper Linton's initial questioning of Reid (before he ran the computer checks) was fully within the scope of the initial traffic stop. As cited above, the Fifth Circuit has repeatedly held that pursuant to a valid stop, a police officer may request the driver's license and registration, run a license and criminal background check, and question the driver regarding her origin and itinerary. *See Dortch, supra* (detention and questioning while computer check was pending was lawful). Here, Linton asked the defendant why he was speeding, why he had been in Dallas, why he was headed to Georgia, and whether he had any prior arrests. These first questions the officer asked were related to the purpose and itinerary of Reid's trip, and were fully within the scope of the detention justified by the traffic stop. *See Brigham*, 382 F.3d at 507-08. Similarly, the officer's

---

[3] The Fifth Circuit recently reiterated, however, that police need not "have 'particularized suspicion' based on essentially direct evidence of a particular specific crime in order to form the 'reasonable suspicion' needed to justify a detention." *United States v. Pack*, 612 F.3d 341, 356-57 (5th Cir. 2010).

detention of Reid while he ran the check was also within the legitimate scope of the purpose of the stop. *See id.* at 509.

Linton determined during the computer check that Reid was not subject to any outstanding warrants and that his vehicle had not been reported stolen. Thus, he must have developed some new reasonable suspicion of criminal activity sufficient to extend the stop beyond this point, including the period of time spent waiting for the K-9 unit to arrive. During the course of the computer check, Linton also ascertained that Reid had not given him a valid rental agreement and that he had failed to disclose his prior arrests. Linton testified at the hearing that he made the decision to request consent to search the vehicle at this time. Tr., pp. 42-43. Upon returning to the vehicle, Linton asked Reid about the discrepancy with the rental agreement, which led to the conversation about Reid's habit of renting one car after another. Linton testified that Reid continued to exhibit a nervous demeanor and poor eye contact at this time. Tr., p. 13. Trooper Linton also told Reid about the prior arrests that he had denied, and Reid stated that they "had all been taken care of." It was at this point that Linton asked Reid if he had anything illegal in the car, which eventually led to the request for consent to search and the calling of the K-9 unit. The video of the traffic stop shows that the K-9 unit arrived on the scene approximately nineteen minutes after Linton first called for it. *See* Gov't Exh. 1.

Since Reid was in the vehicle at all times he was questioned by Linton, the video does not support excessive nervousness or poor eye contact by Reid. Nevertheless, the court must permit "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citations omitted). The courts are generally obliged to accord deference and even "great respect" to an officer's training

and experience. *See United States v. Jenson*, 462 F.3d 399, 405 (5th Cir. 2006). Furthermore, the courts are prohibited from examining and rejecting individually each factor that the police cite as having created reasonable suspicion. *United States v. Pack*, 612 F.3d 341, 358 (5th Cir. 2010), *opinion modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010) (citation omitted). Thus, even if the facts articulated by the officer are individually consistent with innocent travel, taken together they may amount to reasonable suspicion. *Sokolow*, 490 U.S. at 9 (citations omitted); *Pack*, *supra*.

Linton made the following observations during the stop: 1) Reid's presence on a known drug corridor in the early hours of the morning; 2) his nervous demeanor; 3) his lack of a driver's license or any other picture identification; 4) his admitting to having the license suspended in the past; 5) his knowingly providing a rental agreement for a vehicle he had returned a month earlier; (6) his inability to produce the rental agreement for the Kia Sorento he was driving; and (7) his lying about his criminal history, a history that included a drug charge. In the undersigned's opinion, the cumulative effect of Trooper Linton's observations provided him with sufficient reasonable suspicion of criminal activity to extend the stop. For this reason, the continued detention of Reid was constitutional.

### III. The Search

As discussed above, Trooper Linton asked Reid for permission to search his vehicle. Reid refused to consent, and Linton called for a K-9 unit. The dog alerted on the rear of the vehicle, leading to a search by Trooper Linton. Reid argues that this warrantless search violated his Fourth Amendment rights. He further claims that Linton searched a suitcase and two notebooks without reason to believe drugs were concealed therein.

"[S]earches conducted outside the judicial process, without prior approval by judge or

magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *California v. Acevedo*, 500 U.S. 565, 580 (1991). One such exception that is "specifically established and well-delineated" is the so-called automobile exception. *United States v. Ross*, 456 U.S. 798, 825 (1982). "The automobile exception allows police to search a vehicle if they have probable cause to believe that the vehicle contains contraband." *United States v. Fields*, 456 F.3d 519, 523 (5th Cir. 2006) (citing *Maryland v. Dyson*, 527 U.S. 465, 467 (1999)). "[T]he automobile exception does not have a separate exigency requirement: 'If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more.' " *Dyson*, 527 U.S. at 467 (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam)).

An alert by a trained canine provides officers with probable cause to search a car. *United States v. Sanchez–Pena*, 336 F.3d 431, 444 (5th Cir. 2003) ("We have repeatedly affirmed that an alert by a drug-detecting dog provides probable cause to search."); *United States v. Zucco*, 71 F.3d 188, 191–92 (5th Cir. 1995) (once dog alerted to the interior wall of the van, police had probable cause to dismantle the wall). "[I]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Ross*, 456 U.S. at 825.

Here, Trooper Linton testified that the object of the search was narcotics. Tr., p. 49. Thus, when the alert by the canine established probable cause, the search could extend to every part of the vehicle that could contain narcotics. During the search, Trooper Linton went through a suitcase in the rear of the vehicle looking for drugs. He discovered a marijuana grinder containing a small amount of marijuana, two notebooks, and a folder in the suitcase. Linton

testified that when he opened the notebooks, he was initially looking for narcotics. He explained that drug traffickers sometimes hide their cargo in hollowed-out compartments inside "anything that has pages that flip." Tr., p. 55. Linton opened the notebooks and immediately noted several pages of names, addresses, social security numbers, and birthdays. He also found multiple credit reports in the folder. Linton then discovered more credit reports on the back seat of the vehicle, leading him to seriously suspect some non-drug-related criminal activity. At this time he went back to the suitcase to conduct a more extensive search of the items therein. Tr., p. 54.

The undersigned finds that Trooper Linton had probable cause to search the suitcase and the notebooks. Linton was originally searching for narcotics when he opened these items, and both of the items could conceivably contain narcotics. When he first noticed the evidence of identity theft, he promptly closed the notebooks. It was apparently only later, after he had seen other credit reports on the back seat, that he returned to the notebooks. At this time, he had established additional probable cause to believe the notebooks contained evidence of identity theft.

Finally, as pointed out by the Government, Reid's claim that no search warrant was obtained for the search of the computer, thumb drive and cell phones is simply not true. A United States Secret Service Agent sought and was granted a warrant for these items. Doc. # 14. Thus, the search of the vehicle and its contents was constitutional.

### Conclusion

For the above-stated reasons,

**IT IS RECOMMENDED** that the motion to suppress [doc. # 28] filed by defendant Demond Alexander Reid be **DENIED.**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have

**fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 14th day of November 2011.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE